Chief Justice Bibb
delivered tbo Opinio» of ffce Court.
On the 22nd December, 1015, Hardin exhibited his hill against Taylor and others, for relief against the elder patent, and to be let into possession of two hundred acres of land.
The. complainant claims under a certificate granted under the laws of this Commonwealth, to Henry Collins, by the court of Commissions, on the 31st of August, 1793, No. 1.367; entered with the surveyor on the 17th December, 1793; surveyed on the 27th. June, 1799; registered in the land office on the *517 24th August, 1799; sold by the State for non-payment of the second instalment; purchased at that sale by E. Loudon, who assigned to Hardin, to whom the grant issued, on the 6¡h July, 1815
Taylor and Haggard’s Seminary claim.
Collins’ location held invalid.
Act of 1801, protecting claims under laws prior to 1800, which had been surveyed and registered.
Defendants claim under the Act of 1805 granting lands to the academies.
History of the Laws of Kentucky appropriating her vacant lands.
The defendants hold under a Seminary claim, entered with the surveyor on the 10th October, 1807. for the justices of Cumberland; surveyed the 16th November, 1807, patented to James W, Taylor, assignee of the trustees of Cumberland county, on the 5 th July, 1808.
The certificate of the commissioners can not be sustained as a valid location for the land; it is uncertain on its face.
But by the act of December 19th, 1801, 2 Litt. laws, K. 459; 2 Dig. 754, § 5, it is enacted that, “no claims granted under any law prior to the. year 1800, for granting relief to settlers south of Green River, where the same is surveyed, and a plat and a certificate thereof returned to the Register's office, shall be affected by any claim originated under the act entitled ‘an act for settling and improving the vacant lands of this Commonwealth; (Dec. 20th, 1800,) or any law that may be hereafter passed."
The defendants, (now appellants) claim under an act of 1805, 3 Litt. L. K. 279, § 11, authorizing the several county courts in which academies had not been established, or for which no application had been made, to cause to be located 6,000 acres for the use of such school as might thereafter be established within either of the said counties; with a proviso, “that no location made under this act shall he allowed to interfere in any manner with certificate rights, granted to settlers on vacant lands in this Commonwealth;” and if any location under that act be made to interfere as aforesaid, such part was declared null and void.
The better to understand the policy and intent of the preference and superiority of claims originated prior to the year 1800, thus given by the act of 1801, over those originating under the act of 1800, as under any law thereafter passed, as well as of the *518 prohibition contained in the art of 1805, a brief outline of the system of the land laws of Kentucky, for selling her vacant lands and securing the price, will be of assistance.
Acts of 1800.
of 1801.
-of 1805.
-of 1803.
Act of 1806, dividing the state price into twelve annual instalments, and directing the register to sell them for the non-payment of the instalments.
*518 The lands sold and granted by certificates of the commissioners before 1800, were at higher prices than those under the act of 1800 — prior to 1800 the the prices were thirty, forty, or sixty dollars per hundred, according to the time, or the rates of land, expressed in those certificates. Under the an of 1800, lands were to he taken up at twenty dollars per hundred. The legislature had declared and retained a perpetual lien for the payment of the price of those lands, under any of those acts. The third section of the act of 801, 2 Dig. 754, prohibited persons who had obtained certificates under the former laws, at higher prices, from relinquishing, and locating and holding under the acts which sold at cheaper rates, or under the donations to academies and schools. To preserve the revenue of the State, the provisions of 1301, and of 1805, just recited, were necessary and proper. It was intended to prevent the lien of the State, and the Slate prices due from settlers to he evaded by voluntary relinquishments under the higher prices, as well ashy voluntary or involuntary interferences of the donation claims.
Again, in furtherance of this object, by too act of 1803, 3 Litt. L. K. 135, § 1; 2 Dig 757. it was declared, that ‘‘all lands for which a certificate has been or may be granted, (by virtue, of any of the acts alluded to in that act) shall remain subject to the demand of the State for the money due therefor, as head right land, notwithstanding any neglect or omission to carry the same into grant, and a subsequent appropriation (hereof by a military warrant, or otherwise”
By the act of 1806, 3 Litt. L. K. 386: 2 Dig. 765, ail the monies due to the Treasury from sale of vacant lands, south of Green river, under any of (he former laws, were allowed to be discharged in twelve annual instalments, with interest. For enforcing payment and preserving the lien of the *519 State, the Auditor of public accounts was required, annually, to transmit to the Register of the land office, a list of all certificates and entries, upon removed certificates upon which the instalments had not been paid; and the. Register was required to sell at public auction, “taking for his guide the list of the Auditor,” for the instalment in arrear; the land still remaining subject, to the lien of the State, in the hands of every purchaser, until the whole State price was paid; and no grant could issue until the quietus for the whole price was filed in the Register’s office. The books of the court of commissioners who had granted the certificates, and which had been returned to the Register’s office, and the copies of the other certificates granted by the county courts, were placed within the power of the Auditor, to enable him to perform his duties in that behalf.
Certificate directed to be given by the register to the purchaser of the land for the state price.
Purchaser of the claim at the register's sale, obtained the benefit of the survey preciously made.
By this same act of 1806, (section 5,) it was enacted farther “that the Register shall give to every purchaser under this act, a certificate of his purchase; and the sale so certified shall absolutely pass the land described in the location or entry, and the whole force and effect of the claim shall pass and be vested in the purchaser, and shall not be defeated by any assignment or transfer that may have taken place, or by any other defect or cause whatever, except the instalment or instalments for which such sale shall take place, shall have been paid prior to such sale” — “provided,” that this act shall not be construed “to effect the titles ol‘ claimants interfering with any land sold by virtue of this act.”
By the statutes, surveys upon these certificates had been authorized, and a return thereof into the Register’s office required. The necessary effect of a survey on a certificate, was to preclude a second survey on the same certificate; the certificate was the warrant to the entry, with the surveyor and his authority to survey; when that authority was once executed, the certificate was confined to the survey, and the purchaser at the Register’s sale, of a certificate surveyed, took “the whole force and effect of the claim.”
Taylor's appropriation of the land under the seminary claim was a device to avoid the payment of the state price.
Collins’ head right, surveyed and registered prior to 1809, is superior to the claim of Taylor, surveyed afterwards under the seminary donation, and for which he obtained the elder grant.
Alleged relinquishment of Collins’ certificate.
Facts in relation to the alleged relinquishment.
Such were the several provisions of the statutes, with others converging to the same point, the preservation of the revenues of the State, arising from lands sold on a credit, from fraud and dilapidation, from all attempts to exchange the claims bought, (and for which she held a lien,) at higher prices, for lower prices, or for the donation claims. Under this system, the defendants obtained their seminary donation claim, located in 1807, upon the survey made under Collins’ certificate, long before surveyed and registered, and under circumstances which shew that the location and survey of the seminary claim, upon the survey executed on Collins’certificate, was a shift and device intended to avoid the revenue and lien of the State, for the money due on that certificate.
The acts of 1801, of 1803, of 1805, and of 1806, may be considered, first, as looking to the preservation of the revenue; secondly, as promises and engagements on the part of the State to purchasers, under her revenue laws, to protect and secure them in their purchases, according to that system. Upon the proper construction of those acts, the claim of the defendants, under the seminary entry and survey, is inferior to the claim of the complainant, under the registered survey on Collins’ certificate. And the courts are bound by the principles and usages of courts of equity, to lend their aid to relieve against the elder grant, obtained in violation of this previous inchoate right.
Secondly. The defendants rely on a writing filed in the surveyor’s office, purporting to have been made by Rice Haggard, bearing date on the 13th November, 1807, attested by Isaac Taylor, the surveyor of Cumberland county, as a relinquishment of Henry Collins’ certificate, No. 1367.
The facts in relation to that, appear thus:
This certificate, No. 1367, was assigned on the back of it by Collins, to Robert White, on the first of September, 1798; White assigned it to Isaac Taylor on the 12th November; but the year is left blank June, 1799, the survey was executed on *521 that certificate for Henry Collins, by John Montford, deputy surveyor for William Buckner, surveyor of Green county, wherein the land then was situate; it was recorded there, certified by Buckner, and registered on the 24th August, 1799.
Entry, survey, &c. of the seminary, grant of it to Taylor, and his sales to the Haggards - the settlers in 1779 under Collins' claim.
The pretended relinquishment had not the effect to extinguish the claim.
*521 It appears, that on the back of the survey, it was assigned by Collins to Rice Haggard; upon another copy of the survey, is this endorsement, “relinquished in my office, November 13, 1807, by Rice Haggard; entered 14th November, 1807; surveyed 16th same, month and year, by order of the justices of Cumberland county court, James W. Taylor and F. Emmerson, their agents.”
(Signed,) Isaac Taylor, s. c. c.
But the entry of the justices of Cumberland, bears date on the 10th of October, 1807, previous to the date of the relinquishment; the relinquishment was not executed by Rice Haggard, and there is no power of attorney filed with the surveyor, nor does it purport to be made by attorney. On the 5th July, 1808, the grant issued upon this survey of 200 acres, made for the justices of Cumberland County, to James W. Taylor, assignee of the trustees of Cumberland county, covering precisely the same land, and calling for the same corner trees, as in the survey of Collins. On the 17th June, 1809, Isaac Taylor and James W. Taylor, ninety to one acres thereof to Ann and Elizabeth Haggard, the defendants; and on the same day James and Isaac Taylor, convey to Levi Haggard and Benjamin Haggard, the defendants, one hundred and nine acres, the residue of the tract. Rice Haggard, Levi Haggard, Benjamin Haggard, Elizabeth Haggard and Ann Haggard, all settled on the land in 1799, and have resided thereon ever since, except Rice Haggard, who purchased of Isaac Taylor before 1801, holding his bond for a general warranty, and sold out the land to the other Haggards before 1805.
This relinquishment, it was argued at the bar, had the effect to extinguish the certificate granted to Collins, so that the complainant under his purchase from the Commonwealth, for the State price, *522 acquired nothing. But that paper can not have such an affect.
Statute of ’94 authorizing the relinquishment of lands to the state, did not apply to head right lands, so as to extinguish the claim—
—Register’s sale afterwards made, carried to the purchaser all the force and effect of the certificate claim.
Where the relinquishment is made by an attorney, his power must be recorded by the surveyor.
Device to defraud the State of the price of the land, ineffectual.
First, Because, if it were conceded that the relinquishment were executed by Rice Haggard, yet no such consequence would follow. The statute of 1794, 1 Litt. L K. 222, 2 Dig. 717, which authorized the relinquishment by any person in the surveyor's office, expressly declared, that by such relinquishment, the interest of the party “shall be vested in the Commonwealth, and shall never be reclaimed by the party, his, her, or their representatives.” Such a relinquishment transfering the interest to the Commonwealth, could not impair the right of the Commonwealth; it could not extinguish her lien for the state price, nor her right to re-grant it; nor defeat the system which was declared, enforced and maintained, by the statutes of 1801, of 1803, of 1805, and 1806, before cited. The act of 1803, (Digest, 757,) declared, that “all lands for which a certificate has been or may be granted, by virtue of any of the before recited acts, shall re main subject to the demand of the State for the money due therefor, as head right land, notwithstanding any neglect or omission to carry the same into grant, and a subsequent appropriation thereof by a military warrant, or otherwise.” The grant to Taylor, under which the defendants claim, comes within this clause, and the act of 1806, carried to the purchaser “the whole force and effect” of Collins’ certificate.
Secondly, that relinquishment was not executed; there is no certificate of acknowledgment; it was not executed by Rice Haggard in person, be gave no power of attorney, none was produced to the surveyor and recorded with the relinquishment, as required by the act of 1801, 2 Dig. 846; 2 Litt. laws, 435.
Thirdly, It was but a fraudulent shift and device, with intent to evade the statutes, to defraud the revenue laws, and is, therefore, void.
- But the defendants rely on the statute for limiting actions to seven years, 4 Litt. laws, 56; 2 Dig,. *523 365. The answers shew that the settlements commenced in 1799; if the settlers had then any connected title in equity, or law, it was under certificate, subject to the claim and lien of the Commonwealth; no adverse conflicting title, by entry, survey or patent, then existed. The seminary claim was not entered until October, 1807; the proof shews that the settlement was made and held under Collins’ certificate in the origin. The settlers shew no connected title in law or in equity, under the seminary claim, before their deeds of the 17th of June, 1809—the statute, (if it were to be applied) could not have commenced running until that time, and in less than seven years thereafter the suit was instituted, and a lis pendens by process, served on all the defendants, and answers made.
Defence under the seven years' limitation law overruled, because the defendant had a connected title for seven years —
-And because the complainant had purchased at the register’s sales, and obtained his grant within the seven years.
Head right settler shall not protect himself under a seminary patent and the seven years’ law, from the purchase of the claim he attempted to relinquish, to defraud the state out of the price.
Mayes for plaintiffs; Crittenden and Monroe for defendant.
But the statute did not, and can not, run against the Commonwealth whilst she retained her lien; she never parted with it until the grant to the complainant, in 1815.
Nor can the fraudulent and covinous proceeding had by the defendants, in obtaining the elder grant; protect them against the Commonwealth and her assignee; the defendants must be considered as holding under Collins’ certificate, and not adverse to it, under the peculiar and forcible circumstances, of this case. The faith of the state and her system of laws and of revenues, so clearly prescribed, must be preserved from breach and spoliation.
Decree affirmed with costs.